[Civ. No. 11680.   First Dist., Div. Two.—May 16, 1941.]

HARRY F. NELSON, Respondent, v. SAN FRANCISCO BANK (a Banking Corporation), as Executor, etc., Appellant.

John C. Altman and Willard L. Ellis for Appellant.

Raymond D. Williamson and William E. Barden for Respondent.

STURTEVANT, J.—In an action to recover a judgment against the estate of a decedent for money the trial court made findings in favor of the plaintiff and from that judgment the executor of the estate of the decedent has appealed.

In his complaint the plaintiff alleged that the decedent died testate February 21, 1937, that The San Francisco Bank was appointed executor of his estate on the 17th day of March, 1937, that it qualified and ever since has continued to act as such executor. It was further alleged that the plaintiff is a younger brother of the decedent. Continuing the plaintiff alleged as follows: "That at all times herein mentioned, plaintiff placed full faith and credit and confidence in his older brother, said decedent, and never made demand upon him for accounting of the money as hereinafter set forth. That at no time did plaintiff's said older brother ever renounce, repudiate or leave [sic] plaintiff to believe, either by word, act or deed, that the trust as hereinafter set forth did not continue, with plaintiff the beneficiary thereof. That for a long period of time, to wit: ever since the year 1912 until the 21st day of February, 1937, decedent Henry and plaintiff Harry Nelson, engaged in various and sundry enterprises, that at no time was there ever a separation of the proceeds or a division of the profits of the said enterprises; that the said proceeds, at all times, with the full knowledge and acquiescence of plaintiff were placed in the name of said decedent; that at all times it was understood and expressed by and between plaintiff and decedent that the proceeds belonged to the [sic] both of said brothers plaintiff and decedent, to the exclusion of neither; that decedent at no time laid claim to the proceeds to the exclusion of plaintiff; that decedent at all times admitted plaintiff to be the owner of one-half of the said proceeds. That the proceeds above mentioned are now in the hands of defendant San Francisco Bank, and plaintiff is informed and believes and therefore alleges the fact to be that the said proceeds amount to the sum of

Fifteen Thousand Nine Hundred Forty-nine and 03/100 Dollars.''

In its answer the defendant denied plaintiff's allegations and alleged that prior to the commencement of this action the plaintiff presented no claim of any kind or nature against the estate of said decedent. The trial court found all of said affirmative allegations to be true.

The defendant contends there was no evidence that the plaintiff had a property interest in the said ''proceeds''. Nor is there any evidence that said ''proceeds'', or any part thereof, are in the possession of the defendant.

Commencing in 1907 the plaintiff and decedent engaged in the hog business at different times at different places in the states of California, Oregon, and Washington. The last place they were so engaged was at Camp Lewis. At that place the decedent, the plaintiff, and O. P. Woolsey, all three, acted as partners. That venture terminated in 1922 and accounts on that venture were mutually adjusted among the three. At different times both prior to 1922 and subsequent thereto the decedent engaged in his trade as a machinist and as such received wages amounting to as much as seventy-five, eighty, or one hundred dollars a week. The decedent never married. The plaintiff married and had two sons. The decedent and the plaintiff's family lived together. About a year before his death the decedent made a will leaving all of his property to his two nephews, the sons of the plaintiff.

The decedent was apparently a frugal man. He invested a sum in real estate and opened savings accounts at different times in the San Francisco Savings and Loan Society, the Anglo-California Trust Company, Crocker First Federal Trust Company, American Trust Company, the Hibernia Savings and Loan Society, and the Bank of America. At the time of the trial evidence was introduced showing there was on deposit in the name of the decedent in San Francisco Savings and Loan Society $8,741.84, in the Anglo-California Trust Company $483.09, in the American Trust Company $1,094.21, and in the Crocker First Federal Trust Company $4,135.71, making a total of $14,454.85. As to where those moneys came from there was no evidence except as mentioned below. As to the deposits in every bank excepting San Francisco Savings and Loan Society there was no evidence.

As to the deposit in San Francisco Savings and Loan Society the plaintiff testified that after the venture at Camp Lewis was sold out he and his brother Henry, and Woolsey, met and settled the accounts. He does not state where they were but indicates pointedly that the meeting was at or in the neighborhood of San Francisco. The moneys had been advanced by the Nelson boys. The bank of deposit had been the Puget Sound Bank and Trust Company. The account stood in the name of this plaintiff. The moneys paid into the Camp Lewis venture were withdrawn from the sales moneys and repaid. Continuing he testified: "Then after we got everything down here again we sat down, and the money that was left, we divided it up right in three, and I gave Mr. Woolsey a check for his share of it, and I made another check out and gave it to my brother and he deposited it in our account. The check was made on the Puget Sound Bank and Trust Company." The plaintiff was shown the bank book of San Francisco Savings and Loan Society. His attention was directed to a deposit of $2,475.21 on July 31, 1922. Plaintiff testified that was a check he wrote out at Camp Lewis, that it was joint funds of his brother and himself, and that his brother "sent it down here and deposited it". As to a deposit entry of $1783.30 made September 1, 1922, the plaintiff testified that was all Camp Lewis money. As to a deposit entry of $1518.39 made December 7, 1922, the plaintiff testified, "That is also Camp Lewis". The plaintiff did not testify, and he produced no witness who testified that any one of the checks drawn on the Puget Sound Bank and Trust Company was deposited in any particular bank. O. P. Woolsey was called as a witness by the plaintiff. He testified he was present at the accounting. There was a sum, between $15,000 and $18,000, turned over to the two Nelsons. As to the division of the moneys taken out of the Camp Lewis venture he testified: "Well, when we came to winding up the business I did not have so much money in it and there was the two brothers, and so we were figuring out the interest, and we took the interest out of the business and paid it to the Nelson brothers, to the two of them. It was paid individually and when we settled our business Harry handed the money over to his brother and he said, 'Take care of it, here it is again'. Prior to that Harry had the money, the money was all in Harry's hand [sic]

in the Puget Sound Bank.'' What we have just said regarding deposits $2,475.21, $1783.30, and $1518.39, involves a total of $5,776.90. But that is but a little over one-third of the share of the plaintiff and decedent in the sales moneys, a sum stated by Woolsey amounting to from $15,000 to $18,000. What became of the rest of it? How can it be said the $5,776.90 were trust moneys when the decedent was entitled in his own right to a sum estimated at from $7,500 to $9,000? We think the record contains no answer to the question.

There was evidence that from the beginning of the relations between the decedent and the plaintiff checks were drawn from time to time in favor of the latter. From the year 1922, the plaintiff was looking for employment and business investments. The record does not disclose that he found either. The plaintiff's family, consisting of four persons, in addition to the decedent, was supported out of checks drawn on the banks. How much was drawn in behalf of the plaintiff personally, how much in behalf of the plaintiff and the decedent in their joint ventures, and how much in support of the household expenses, the record is silent.

During the period 1922 to the date of the death of the decedent, February 21, 1937, the record discloses that the decedent was employed as a machinist and that his pay checks in whole or in part were deposited in the banks. How much the record does not disclose. Assuming his pay check was $50 per week (the smallest amount testified to) and that he worked fifty-two weeks a year, he would have earned $2,600 per year. In fifteen years he would have earned $39,000.

If we understand the plaintiff correctly it is his contention the decedent gave to the partnership his personal earnings. But construed most favorably in behalf of the plaintiff, the proof does not show that fact. The most that could be claimed was a promise to make a gift. However, until the bank accounts were placed in the names of the partners, or some assignments were made, the promise to make a gift was incomplete.

The foregoing facts it will be conceded tend to prove that, at least at times, the decedent and the plaintiff were partners, that their ventures were profitable, that the plaintiff entrusted his share in the profits to the decedent, and that no accounting has ever been had. They also show the de-

cedent received large sums of money that were not partnership funds. Finally, they show that from 1922 down to the date of the death of the decedent, he had caused numerous payments to be made to the plaintiff. What balance, if any, was due plaintiff at the time of decedent's death can be ascertained only by having an accounting. The evidence introduced at the trial would have warranted the trial court in ordering an accounting. (1 C. J. S. 655, Accounting, sec. 19; *Elizalde* v. *Murphy,* 163 Cal. 681, 685 [126 Pac. 978].) Upon taking that account it can be ascertained what amount, if any, of plaintiff's money remained in the hands of decedent at the time of his death. Until such an accounting is had the amount of the plaintiff's claim is wholly problematical.

In the brief of the plaintiff there are statements to the effect that the decedent "admitted that one-half of said money was his brother's, respondent herein." An examination of the record discloses no such admission in any place. However, it will be conceded there were statements by the decedent that the plaintiff had some interest in some of the moneys at certain designated times.

The plaintiff concedes that in this kind of a case the proof should be clear, satisfactory and convincing. (*Bollinger* v. *Bollinger,* 154 Cal. 695 [99 Pac. 196].) However he claims "when there is substantial evidence to support the existence of a trust, it must be left to the trial court, and its determination that such evidence is clear, satisfactory and convincing will be accepted by the appellate court as conclusive." (*Turman* v. *Ellison,* 37 Cal. App. 204, 208 [174 Pac. 396].) But the vice in that contention is the assumption that there is substantial evidence. We do not hesitate in stating that in the record before us there was no substantial evidence of the existence of a balance in a trust fund.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with what has been stated above.

Nourse, P. J., and Spence, J., concurred.